**John L. ANDERSON, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. 98–4100–SAC.

United States District Court,
D. Kansas.

May 31, 2000.

Kevin W. Babbit, Kansas Legal Svcs. of Emporia, Emporia, KS, for plaintiff.

Nancy Landis Caplinger, Mary K. Ramirez, Office of United States Attorney, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant John L. Anderson's applications for disability insurance benefits under Title II of the Social Security Act ("Act") and for supplemental security income ("SSI") under Title XVI of the Act. The case is ripe for decision on the parties' briefs filed pursuant to D.Kan. Rule 83.7.

**PROCEDURAL HISTORY**

The claimant applied for disability benefits and SSI on June 15, 1995, asserting he had been disabled as of May 27, 1995. His claims were denied initially and on reconsideration. At the claimant's request, a hearing before an administrative law judge ("ALJ") was held on June 25, 1996, and he appeared in person and with counsel. (Tr. 39–95). Witnesses at the hearing were the claimant and a vocational expert. The ALJ subsequently issued his decision on September 24, 1996, finding that the claimant was not disabled as defined under the Social Security Act. The Appeals Council denied the claimant's request for review after also considering a letter from the claimant's attorney and a report from the claimant's treating physician. Thus, the ALJ's decision stands as the Commissioner's final decision. *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citing *See* 20 C.F.R. § 404.981).

**STANDARD OF REVIEW**

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). "A finding of ' "no substantial evidence" will be found only where there is a "con-spicuous absence of credible choices" or "no contrary medical evidence." ' " *Trimiar v. Sullivan,* 966 F.2d 1326, 1328 (10th Cir.1992) (quoting *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983)) (quoting *Hemphill v. Weinberger,* 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d at 858 (citation omitted).

The court's review also extends to determining whether the Commissioner applied the correct legal standards. *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir. 1994). Besides the lack of substantial evidence, reversal may be appropriate when the Commissioner uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

*Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir.1985)). The court "must examine the record closely to determine whether substantial evidence supports" the Commissioner's determination. *Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir.1996). The court is not to reweigh the evidence or substitute its judgment for the Commissioner's. *Glass v. Shalala,* 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). Nonetheless, " '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence .....' " *Winfrey,* 92 F.3d at 1020 (quoting *Huston v. Bowen,* 838 F.2d

1125, 1133 (10th Cir.1988)). The courts do not mechanically accept the Commissioner's findings. *Claassen v. Heckler*, 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the" Commissioner. (citation omitted)). Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. *Holloway v. Heckler*, 607 F.Supp. 71, 72 (D.Kan.1985). "'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the ... [Commissioner's] decision and, on that basis determine if the substantiality of the evidence test has been met.'" *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The court's review of the record includes evidence plaintiff presented for the first time to the Appeals Council. *See O'Dell v. Shalala*, 44 F.3d at 858, 859.

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The claimant has the burden of proving a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar*, 966 F.2d at 1329. The burden

then shifts to the Commissioner to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989). The Commissioner satisfies this burden if substantial evidence supports it. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir.1993).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Commissioner determines the claimant is disabled or not. *Gossett*, 862 F.2d at 805. Step one is whether the claimant is currently engaged in substantial gainful activity. If claimant is not, the fact finder in step two decides whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 141, 107 S.Ct. 2287. Step three entails looking at whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, step four requires the claimant to show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity ("RFC") to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *See Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988).

**ALJ'S FINDINGS**

In his order of September 24, 1996, the ALJ made the following findings:

1. John L. Anderson, Social Security Account Number 509–58–3282, filed applications seeking a period of disability, disability insurance benefits, and supplemental security income on June 15, 1995.

2. The evidence establishes that the claimant had the requisite insured status

on May 27, 1995, his alleged onset date of disability, and continues to have such insured status through at least the date of this decision.

3. There is no evidence that the claimant has engaged in work activity subsequent to May 27, 1995.

4. The medical evidence establishes that the claimant has fibromyalgia and depression secondary to his physical condition.

5. The claimant's testimony with respect to his subjective complaints, associated restrictions, and inability to work was not entirely credible for reasons more fully set forth in the Rationale.

6. Since May 27, 1995, the claimant has retained the residual functional capacity to lift and carry no more than 10 pounds frequently and 25 pounds occasionally; he should engage in no more than occasional stooping, twisting, squatting, kneeling, and crawling; he requires the ability to alternate between sitting and standing; is restricted from climbing ropes, ladders and scaffolding; can only occasionally climb ramps or stairs; can do no repetitive pushing and pulling of foot controls; can do no repetitive work with his arms above the head; must avoid concentrations of heat and humidity, as well as the cold; and must avoid unprotected heights and hazardous moving machinery. He also is able to perform only simple, routine, repetitive work.

7. The claimant cannot do his past relevant work.

8. Given the claimant's age of 42 to 43 years of age, with a high school education and four years of college, with his past work experience providing him with no transferable skills, and his residual functional capacity set out above, the vocational expert identified the jobs of cashier, security monitor and self service laundry attendant which such an individual could perform and the undersigned finds the numbers of jobs cited by the vocational expert to be significant.

9. The claimant was not and is not at any time on or before the date of this Decision under a disability as defined by Titles II and XVI of the Social Security Act and his applications must therefore be denied.

(Tr.19–20).

## SUMMARY OF ARGUMENTS

The claimant first argues that the ALJ failed to give sufficient weight to his treating physician's most recent opinions. The ALJ limited his consideration to selected parts of the physician's opinions and then isolated those parts from the physician's subsequent opinions on the claimant's current medical condition. The claimant also argues that substantial evidence does not sustain the ALJ's credibility findings regarding the claimant's pain testimony.

## FACTS

At the time of the administrative hearing on June 25, 1996, Mr. Anderson was 43 years old. His past relevant work experience included police officer, jail house keeper, and corrections officer. His last period of employment was as a police officer with the Peabody Police Department from August of 1992 through May 27, 1995. According to the claimant, the chronic pain and muscle spasms caused by fibromyalgia forced him to quit this job. He has not held any other job since that time.

The medical evidence of record regarding this condition dates back to 1993. Dr. Hodson in August of 1993 began treating Mr. Anderson for muscle discomfort in his right arm and neck and for difficulty in sleeping. In January of 1994, Dr. Hodson considered a diagnosis of possible fibromyalgia, prescribed a medication, and referred him to Dr. Lies for further evaluation. The medication did not provide any significant relief.

In his notes dated March 24, 1994, Dr. Lies recorded the patient's symptoms as "persistent daily aches" with the sensations of muscle movement, tightening and

spasms. Mr. Anderson told Dr. Lies that his condition has not kept him from working. The physical examination did not verify much, other than mild tenderness in "fibrocytic points." (Dk.126). Dr. Lies concurred with Dr. Hodson's assessment of possible fibromyalgia and prescribed another medication.

In December of 1994, Mr. Anderson returned to Dr. Hodson relating continued problems with muscle tension, stiffness, soreness and sleeping. The physician prescribed a different medication and suggested a follow-up in three or four weeks. The medical records reflect that Mr. Anderson did not see Dr. Hodson again for this condition until May 30, 1995.

In May, Mr. Anderson complained about numbness in arms and legs, muscle spasms at various points, difficulty sleeping, and waking at night with a choking sensation. Dr. Hodson recorded as the subjective complaints: "In again because of above problems related to fibromyalgia. The muscle twitching, pain, knots and stiffness is really causing a lot of anxiety. We discussed this at length and it sounds like his symptoms are becoming more and more the classic fibromyalgia syndrome." (Tr. 142). In his exam, Dr. Hodson found multiple trigger points with "the worst ones ... in the low back where large knots of muscle are palpable." (Tr. 142). Dr. Hodson referred him to a massage therapist, prescribed a different medication, and wrote him a note requesting three weeks of sick leave. Dr. Hodson also noted that Mr. Anderson doubted his physical ability to function safely as an officer in his current condition. Mr. Anderson testified that he terminated his employment in late May because of his difficulties with fibromyalgia.

At the visit on June 13, 1995, Dr. Hodson completed SRS disability forms for Mr. Anderson. The patient complained of burning sensations in his feet, difficulty getting up stairs, and difficulty with sleeping. The physical examination revealed muscle tightness and tenderness "over any

tendon palpated." (Tr. 143). Dr. Hodson encouraged him to stay "active as much as possible" and prescribed a different medication. On June 30, 1995, Dr. Hodson doubled the medicine dosage and observed the muscle nodules in the lumbar area and hamstrings were "quite tender on palpation." (Tr. 143). Dr. Hodson further arranged for Mr. Anderson to be seen by Dr. Fred Wolfe, a physician in Wichita having "a special interest in fibromyalgia." (Tr. 143).

On July 10, 1995, the SRS disability examiner interviewed Dr. Hodson by telephone about Mr. Anderson's functional limitations. Dr. Hodson told the examiner that Mr. Anderson "could not return to his" former employment as a police officer but that he could do sedentary work, like a desk job. Dr. Hodson further observed that Mr. Anderson's depression was related to his physical condition and does not pose any functional limitation other than the pain impacting his ability to concentrate.

After seeing Mr. Anderson just one time, Dr. Fred Wolfe wrote Dr. Hodson with his conclusions:

> Mr. Anderson does satisfy the 1990 American College of Rheumatology for the classification of fibromyalgia. He has 15 of 18 tender points, widespread pain, marked sleep disturbance, GI problems, fatigue, and depression which so frequently mark this syndrome.
>
> He's been on varying treatments for the disorder which have included tricyclic anti-depressants used at night for sleep, anxiolytic agents, nonsteroidal agents, etc. But none of these agents have really been effective.
>
> . . . .
>
> . . . . He's given up his job as a police officer because sitting in the car and driving causes him pain in his arms and shoulders. He reports having times when he simply could not get out of his car because of pain in his back and legs. He believes that he is unable to work

because of these problems. During the day he tries to keep physically active by working in the garden and doing similar activities.

. . . .

In summary, then, I think that Mr. Anderson would be better off in the long run if he were able to get back to some sort of employment activities even in the face of the discomfort that he has. Fibromyalgia seems to be modulated by psycho-social and stress related factors. I think if he can get to a situation where the future looks brighter for him he may be able to accomplish these things. I would encourage him to use over the counter medications, and I would urge discontinuation of the caffeine and perhaps some degree of behaviorally based pain management program.

(Tr. 138–40).

In August of 1995, Mr. Anderson saw Dr. Hodson with complaints of sinus problems and fibromyalgia. Mr. Anderson fell off his porch in September and was unable to get back up. Dr. Hodson treated him for a calcaneal fracture of the left foot that required a cast. The treatment notes for October 23, 1995, reflect that Dr. Hodson completed some disability papers and opined that: "It's impossible to tell in the foreseeable future when his fibromyalgia may regress to the point that he will be employable so we're leaving it open ended at this point." (Tr. 220).

In November of 1995, Dr. Hodson completed a medical source statement regarding Mr. Anderson's functional limitations. Dr. Hodson noted that the patient could lift ten pounds frequently and up to twenty-five pounds occasionally. He could stand and/or walk for up to one hour at one time for a total of four hours in an eight-hour work day. He could sit for up to fifteen minutes at one time for a total of two hours in an eight-hour work day. In describing the findings and symptoms behind the functional limitations, Dr. Hodson wrote: "Fibromyalgia—moderate to severe—muscle stiffness, pain, decreased range of motion, and unpredictable muscle spasm." (Tr. 234).

In December of 1995, Mr. Anderson saw Dr. Hudson and requested a prescription drug to help him sleep. Dr. Hudson recorded that the patient was suffering from insomnia due to fibromyalgia. Dr. Hudson prescribed Doxepin.

In February of 1996, Mr. Anderson's attorney wrote Dr. Hudson with "two follow-up questions" regarding the medical source statement. (Tr. 235). The first question was: "In the medical source statement you describe Mr. Anderson as suffering from unpredictable muscle spasms. How often in a typical week or month do these spasms occur and what effect do they have on Mr. Anderson?" (Tr. 235). Dr. Hodson responded: "Mr. Anderson states he has spasms nearly continuously. He needs his wife's help in dressing each morning and for many ADLS [activities of daily living]." (Tr. 235). The other questions focused on Mr. Anderson's need to rest to relieve pain. One question asked: "If Mr. Anderson was to lie or rest to relieve the pain, for how long must he do so?" (Tr. 236). Dr. Hodson responded: "Pain never goes away completely. Sleeps maximum of 3 hours at a time at night without being awakened by pain." (Tr. 236).

On March 20, 1996, Mr. Anderson was seen by Dr. Hodson for shoulder and elbow pain attributed to lifting a tire from the trunk. "When it [the tire] came over the back edge of the trunk it jerked down on his arm and he's had pain there ever since and it's getting harder to lift his arm." (Tr. 219). Dr. Hodson recorded his thought that it was "a minor sprain and muscle tear but with his [Mr. Anderson's] fibromyalgia it makes it difficult to know." Dr. Hodson prescribed a medication and ordered physical therapy.

At the administrative hearing, Mr. Anderson testified about his physical limitations. He said his capacity for standing at one time was twenty minutes, for sitting

at one time was twenty minutes, and for walking without resting was one-half block. He experiences severe knotting and leg pain when walking. He described his pain as constant but that it gets worse with repetitive motion performed for fifteen minutes or longer. Four to five times during a typical day, he suffers from headaches, pain and muscle cramping and knotting that build up to a point that he must lie down for approximately an hour and either have his muscles massaged or soak in a hot tub.

Mr. Anderson testified that his condition restricts his daily living activities. On some mornings, his wife helps him out of bed and helps dress him. He has difficulty reaching behind to grab his shirt while dressing and reaching up to comb his hair. He mows the lawn with a riding lawn mower and occasionally goes fishing with the help of his children and wife, but his condition now keeps him from working on his car. He tries to stay somewhat active with daily chores, but he is finding it more difficult to wash the dishes or vacuum for any length of time. As far as medication, Mr. Anderson testified he was currently taking Doxepin at night to help with sleeping and pain medications like Tylenol or Excedrin to offer some pain relief. He explained that the physicians told him the over-the-counter pain medications were "as good" as prescription medication in relieving the daily pains associated with fibromyalgia.

Janice Hastert, testified as a vocational expert that the hypothetical claimant could not do any of his past relevant work but that he could perform sedentary work, such as cashier, ticket seller, cafeteria attendant, security monitor, and self-service laundry attendant. When the need to lie down for up to one hour in a work day was added to the limitations of the hypothetical claimant, Ms. Hastert opined that the person would not be able to work.

Following the ALJ's adverse decision, Mr. Anderson showed Dr. Hodson this decision and asked him to write a letter in support of his disability. Dr. Hodson wrote a letter dated November 20, 1996, which states in relevant part:

Apparently he received a denial on his social security disability due to some things that were stated in his record. I did get a chance to review the document giving the rational for this denial. My concern is that much of the information which was used to go against his disability was information gleaned from records early in the course of his illness when his disability was not as severe as it is currently and at a point where we did not even know the diagnosis of his condition, thus there was no way to make a prognosis.

There was reference to a visit of March 20th, 96 that indicated his last visit was due to pain induced by an injury while lifting a tire out of the back of his trunk. The records really were not clear in stating that the pain was incommensurate with the means of injury and would not have been a problem in anyone who does not have fibromyalgia. In other words, a rather minor sprain or injury caused a major amount of muscle spasm and pain.

At the time of this writing, John and his wife both report difficulty with him even making it through normal activities of daily living. He has gained weight recently and has been trying to exercise and is found that if he simply walks around the block, that's enough that he has to go lie down afterwards to rest because of the muscle tightness and spasm. He is unable to sit for more than 20 to 30 minutes at a time before he either needs to undertake some other activity to stretch his muscles and loosen up and then often times the muscle aches turn into muscle spasms and he has to go lie down at least three or four times a day because of this.

In my opinion, Mr. Anderson is medically disabled at this time and I can think of no gainful employment with which he would really be compatible. If there

were such a job that he work on his own time and be able to leave to go lie down and rest or stretch, it might be possible, but it certainly couldn't be anything that required his continued presence and dependability and couldn't be anything that require a lot of concentration because he's so distracted from his pain and spasms.

(Tr. 242–43).

## FIBROMYALGIA

■ "Fibromyalgia is defined as a syndrome of pain in the fibrous tissues, muscles, tendons, ligaments, etc." *Duncan v. Apfel*, 156 F.3d 1243, 1998 WL 544353, at *2 (10th Cir. Aug.26, 1998) (Table) (citing *The Merck Manual of Diagnosis & Therapy*, at 1369 (Robert Berkow & Andrew J. Fletcher eds., 16th ed.1992)). "The symptoms of fibromyalgia are entirely subjective, and there are no laboratory tests to identify its presence or severity." *Ward v. Apfel*, 65 F.Supp.2d 1208, 1213 (D.Kan. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996)). "Because fibromyalgia, ..., is diagnosed by ruling out other diseases through medical testing, ..., negative test results or the absence of an objective medical test to diagnose the condition cannot support a conclusion that claimant does not suffer from a potentially disabling condition." *Lantow v. Chater*, 98 F.3d 1349, 1996 WL 576012, at *1 (10th Cir. Oct.8, 1996) (Table). "Courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling." *Ward v. Apfel*, 65 F.Supp.2d at 1213 (citing *Sarchet v. Chater*, 78 F.3d at 309; *Cline v. Sullivan*, 939 F.2d 560 (8th Cir. 1991); *Biri v. Apfel*, 4 F.Supp.2d 1276 (D.Kan.1998)).

## TREATING PHYSICIAN'S OPINION

■ "Generally, the ALJ must give controlling weight to a treating physician's well supported opinion about the nature and severity of a claimant's impairments." *Adams v. Chater*, 93 F.3d 712, 714 (10th Cir.1996). *See Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994). "The [Commissioner] must give substantial weight to the evidence and opinion of the claimant's treating physician, unless good cause is shown for rejecting it. If an ALJ rejects the opinion of a treating physician, he or she must articulate specific, legitimate reasons for doing so." *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir.1994) (citation and quotations omitted); *see Ward v. Apfel*, 65 F.Supp.2d at 1215. A treating physician's opinion may be rejected if his or her conclusions are not supported by specific findings, *Castellano*, 26 F.3d at 1029 (citing in part 20 C.F.R. § 404.1527(d)) or by clinical and/or laboratory diagnostic techniques, if they are inconsistent with other substantial evidence in the record, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Castellano*, 26 F.3d at 1027, or if they are "brief, conclusory, and unsupported by medical evidence," *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir.1987).

## Analysis

■ The ALJ chose to accept only part of the treating physicians' opinions. The ALJ accepted Dr. Hodson's early opinion in July of 1995 that Mr. Anderson could not perform his past relevant work but that he could do sedentary work. The ALJ characterized Dr. Wolf's opinion in July of 1995 as having "recommended strongly that the claimant return to work activity." (Tr. 17). From Dr. Hodson's medical source statement prepared in November of 1995, the ALJ accepted the lifting and carrying capacity, pushing and pulling capacity and other physical factors, but he rejected the restrictions placed on Mr. Anderson's capacity for standing, walking and sitting. The ALJ opined: "Consideration of the whole record, leads to the conclusion that even claimant's treating physicians, whose opinions are accorded great weight under the Commissioner's regulations, believe claimant is able to engage in work activity." (Tr. 17). Finally, with respect to Dr. Hodson's notes

about Mr. Anderson's need to rest during the work day, the ALJ wrote:

[T]he claimant's need to lie down four to five times a day is also not supported by the assessment of the claimant's physicians. His physicians' treatment notes do not document the frequency of the claimant's need to lie down as reported by the claimant. Only when claimant's attorney requested a supplemental statement of the claimant's treating physician which contained leading questions for him to answer, did the physician report the claimant's need to lie down. Even then, he only reported what the claimant indicated to him, *i.e.*, that the claimant estimated that he needs to lie down *or rest* four to five times daily. Importantly, the doctors who seen the claimant indicated that the claimant had the capacity to work, although at a lower exertional level, and in fact recommended that he do so.

(Tr. 18).

The court finds that the ALJ did not give substantial weight to the treating physicians' opinions, lacked good cause for limiting his reliance to selected portions of those opinions, and did not articulate specific and legitimate reasons for rejecting the other portions. The ALJ gave no apparent weight to Dr. Hodson's notation in October of 1995 that "It's impossible to tell in the foreseeable future when his fibromyalgia may regress to the point that he will be employable so we're leaving it open ended at this point." (Tr. 220). This notation contradicts the ALJ's finding that the treating physicians[1] believed Mr. Anderson was "able to engage in work activity." (Tr. 17).

Further contradiction is found in Dr. Hodson's source statement of November of 1995 which shows that plaintiff, at most, could work six-hour days considering his sitting and standing capacity. The ALJ discounts this latter opinion first as inconsistent with Dr. Hodson's statement five months earlier that Mr. Anderson "was able to perform sedentary type of work such as a desk job." This inconsistency is of questionable weight because the disability examiner's report in July does not indicate that she asked about full-time employment or that she asked Dr. Hodson to quantify Mr. Anderson's capacity in work hours. The ALJ further discounts Dr. Hodson's source statement by assuming that the restricted standing and walking capacity was attributable to Mr. Anderson's heel fracture. Instead of supporting this assumption, the record completely rules it out. On the completed source statement, Dr. Hodson attributes the prior capacity limitations solely to what he described as "fibromyalgia—moderate to severe." (Tr. 234).

The ALJ's decision contains no legitimate reasons for rejecting Dr. Hodson's supplemental opinions made in February of 1996. Dr. Hodson's treatment notes do refer to Mr. Anderson resting and limiting his activities in an apparent effort to avoid pain. In fact, the six-hour restriction on walking and sitting contained in the November source statement can be explained by Mr. Anderson's need to lie down or rest during the other two hours. That Dr. Hodson's supplemental opinions were gathered by Mr. Anderson's counsel is no reason for rejecting them. *See Rayton v. Chater,* No. 95–4188–SAC, 1997 WL 263738, at *4 (D.Kan. Apr.21, 1997). Those questions that appear in the attor-

---

1. The ALJ refers at least twice to Dr. Wolfe as "strongly" recommending that Mr. Anderson "should return to work." (Tr. 17, 18). The ALJ reads into Dr. Wolfe's recommendation a medical opinion that Mr. Anderson has the capacity to work a full-time job. The contents of Dr. Wolfe's letter, however, do not sustain the ALJ's reading: "In summary, then, I think that Mr. Anderson would be better off in the long run *if he were able to* get back to *some sort of employment activities* even in the face of the discomfort that he has." (Tr. 140) (italics added). The conditional language and vague reference to "some sort" of a job found in Dr. Wolfe's letter hardly qualify as substantial evidence that a treating physician believed Mr. Anderson had the physical capacity to perform a full-time sedentary job.

ney's letter and that are legible on the copy of record are not leading and provide no basis for finding that Dr. Hodson simply parroted back what the attorney wanted him to write. Even if Dr. Hodson only reported what Mr. Anderson had told him during the course of treating him, this is still significant considering that the symptoms of fibromyalgia are principally subjective. Finally, there is no opinion of record from a treating physician that as of February of 1996 Mr. Anderson had the capacity to perform full-time work at a lower exertional level.

In response to the ALJ's decision, Dr. Hodson wrote in November of 1996 a letter to Mr. Anderson's attorney explaining what he perceived as the ALJ's erroneous impressions of the medical record. Specifically, Dr. Hodson's concern was that the ALJ relied on information taken during the early stages of Mr. Anderson's illness "when his disability was not as severe as it is currently and at a point where we did not even know the diagnosis of his condition, thus there was no way to make a prognosis." (Tr. 242). Dr. Hodson summarized Mr. Anderson's condition, including the daily need to lie down three or four times to relieve the muscle spasms. Finally, Dr. Hodson opined that Mr. Anderson was medically disabled from all gainful employment, except for positions that did not require much concentration or dependability and that allowed him to lie down whenever his condition required it. The opinions expressed in this letter are not only consistent with the walking and sitting restrictions found in Dr. Hodson's source statement of November of 1995, but they further corroborate the opinions contained in his supplemental statement of February of 1996.

The court finds that the ALJ and the Appeals Council lacked good cause and failed to give specific and legitimate reasons for discounting the treating physicians' later opinions in favor of a selective reading of earlier opinions and treatment notes. The record does not contain substantial evidence to sustain the ALJ's and Appeal Council's decision to reject the treating physician's opinions in this way.

**CREDIBILITY FINDINGS OF CLAIMANT'S PAIN TESTIMONY**

■ "Generally, credibility determinations are the province of the ALJ, 'the individual optimally positioned to observe and assess witness credibility.'" *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir.1996) (quoting *Casias v. Secretary of Health & Human Servs.*, 933 F.2d at 801). Consequently, a "court ordinarily defers to the ALJ as trier of fact on credibility, ... [but] deference is not an absolute rule." *Thompson v. Sullivan*, 987 F.2d at 1490 (citations omitted). It is "recognize[d] that some claimants exaggerate symptoms for purposes of obtaining government benefits, and deference to the fact-finder's assessment of credibility is the general rule." *Frey v. Bowen*, 816 F.2d at 517. Thus, a court "will not upset such [credibility] determinations when supported by substantial evidence." *Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir.1995) (internal quotation omitted).

■ " 'To establish disabling pain without explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony of pain evaluated by the ALJ and weighed alongside the medical evidence. An ALJ may not ignore the evidence and make no findings.' " *Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir.1995) (quoting *Huston v. Bowen*, 838 F.2d at 1131 (citations omitted)). Where there is evidence of allegedly disabling pain, courts in the Tenth Circuit look to *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987), for the framework of proper analysis:

"We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and

(3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling."

*Kepler v. Chater*, 68 F.3d at 390 (quoting *Glass v. Shalala*, 43 F.3d at 1395). If objective medical evidence shows a pain-producing impairment, the ALJ then must consider the claimant's allegations of severe pain and decide whether she believes them. *Thompson v. Sullivan*, 987 F.2d at 1489. Some of the factors to be considered at this point include:

"the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony and objective medical evidence."

*Kepler*, 68 F.3d at 391 (quoting *Thompson*, 987 F.2d at 1489).

▮ The ALJ must link his credibility finding to substantial evidence, that is, the ALJ needs to "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." *Kepler*, 68 F.3d at 391. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d at 1133 (footnote omitted). The "ALJ 'must articulate specific reasons for questioning the claimant's credibility' where subjective pain testimony is critical." *Kepler*, 68 F.3d at 391 (quoting *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir.1992)).

▮ In evaluating claimant's testimony, the ALJ noted that the claimant had worked in the past with fibromyalgia, that the treating physicians had opined the claimant was able to work, that the claimant's activity level suggests greater physical capacity than he described, that treating physicians had assessed the claimant's restrictions differently than the claimant, and that the medical evidence is not consistent with claimant's testimony on the severity of his restrictions and pain. The court does not find substantial evidence in the record to support the ALJ's reasons given for his credibility determination.

While the medical record does show that the treating physicians early on were considering a diagnosis of fibromyalgia to explain some of Mr. Anderson's physical problems experienced during his police work, it also shows his condition worsened in May of 1955 as evidenced by Dr. Hodson's notation that "his symptoms are becoming more and more the classic fibromyalgia syndrome," and by Dr. Hodson's course of treatment that included a new prescription, massage therapy, and three weeks of sick leave. As far as the ALJ's reason that treating physicians believed Mr. Anderson was able to engage in full-time employment stated above, the court relies on its earlier conclusion that the record, as a whole, does not sustain the ALJ's conclusion.

The court does not find substantial evidence in the record showing that Mr. Anderson's daily activity level was inconsistent with his claimed disability. A claimant "need not prove that her pain precludes all productive activity and confines her to life in front of the television." *Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir.1996) (citation omitted). Evidence that a claimant engages in limited activities may be considered, along with other relevant evidence, in considering entitlement to benefits. *Gay v. Sullivan*, 986 F.2d 1336, 1339 (10th Cir.1993). Trying to stay active by occasional gardening, and restricted efforts at riding a lawn mower and fishing, and unexplained dirty fingernails are not substantial evidence of a daily activity level exceeding what Mr. Anderson described as his physical capacity. " 'Occasional symptom-free periods—and even the sporadic ability to work are not incon-

sistent with disability.' " *Reddick v. Chater,* 157 F.3d 715, 724 (9th Cir.1998) (quoting *Lester v. Chater,* 81 F.3d 821, 833 (9th Cir.1995)). The record further shows that Mr. Anderson's wife assists him in meeting some of his requirements for daily living.

The record does not establish marked differences between the claimant's assessment of his restrictions and those assessments made by the treating physicians near in time. As for Mr. Anderson's need to lie down after physical activity, the court has already observed that the medical record supports his testimony. Faced with a similar contention in a fibromyalgia case, the Tenth Circuit recently held:

> Next, the ALJ stated that plaintiff's claim that she must lie down several times during the day because of pain is unsupported. However, "[t]he pain [of fibromyalgia] is aggravated by strain or overuse," *The Merck Manual of Diagnosis & Therapy,* at 1370, and is accompanied by symptoms such as poor sleep and fatigue, *see id.* Plaintiff's problems with sleep disturbances and fatigue are documented. (citation omitted). Therefore, it is not apparent what evidence supports the ALJ's finding that she need not lie down periodically during the day.

*Duncan v. Apfel,* 156 F.3d 1243, 1998 WL 544353, at *2 (10th Cir. Aug.26, 1998). Likewise, the record here establishes that Mr. Anderson suffers from poor sleep and fatigue, and the record contains no evidence to support the ALJ's finding that Mr. Anderson need not lie down three to four times a day. "Given the nature of fibromyalgia and fatigue, [Mr. Anderson's] symptoms, and the medical evidence that supports those findings to the extent possible, the ALJ committed error when he discredited [Mr. Anderson's] pain testimony for lack of objective medical evidence." *See Baca v. Apfel,* 2000 WL 357268, at *1 (9th Cir. Apr.6, 2000).

██ For all of the above reasons, the ALJ's finding that the plaintiff is capable of performing a narrow range of sedentary work is not supported by substantial evidence. "Because sedentary work is the lowest classification under the statute, there is no need for further proceedings in this matter other than a remand for an award of benefits." *Sisco v. U.S. Dept. of Health and Human Services,* 10 F.3d 739, 745–46 (10th Cir.1993). " 'Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose.' " *Sorenson,* 888 F.2d at 713 (quoting *Williams,* 844 F.2d at 760). The vocational expert testified that the hypothetical claimant could not be gainfully employed if he needed to lie down for up to one hour during a work day. The evidence of record is more than substantial that the plaintiff's disability precludes him during the relevant time period from engaging in any full-time sedentary work.

IT IS THEREFORE ORDERED that the Commissioner's decision denying benefits to the plaintiff is reversed, and the case is remanded to the Commissioner for an immediate award of benefits.